UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSEPH PICA,

                Plaintiff,

            -against-

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL
SECURITY,[1]

                Defendant.
-----------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-4584 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Joseph Pica brings this action against defendant Nancy A. Berryhill, Acting

Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42

U.S.C. § 405(g), seeking review of the Commissioner's determination that Pica is not entitled to

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (*See generally*

Compl. (Doc. No. 1).)  Pica maintains that the Commissioner's determination is based on an

erroneous application of the law and is not supported by substantial evidence in the

administrative record. (Pl.'s Mem. (Doc. No. 15) at 6.)[2]  Both Pica and the Commissioner have

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule")

12(c). (*Id.*; Def.'s Mem. (Doc. No. 16) at 6.)  For the reasons set forth below, Pica's motion is

denied and the Commissioner's motion is granted.

## BACKGROUND

### I.    Procedural History

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill, now the Acting Commissioner of Social Security, is hereby substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this action. *See* Doc. No. 16 at 1, f.n. 1.

[2] For ease of reference, citations to the parties' briefs utilize the Electronic Case Filing System ("ECF") pagination.

Pica filed an application for DIB on December 6, 2012, alleging disability as of October 15, 2011, due to herniated discs in the neck and the thoracic and lumbar spine. (Admin. R. (Doc. No. 8) at 166–67, 199.) The application was denied on February 28, 2013. (*Id.* at 82–93.) On March 13, 2013, Pica requested a hearing before an Administrative Law Judge ("ALJ") to review his application. (*Id.* at 94.) On June 3, 2014, ALJ Moises Penalver held a hearing, at which Pica appeared and testified. (*Id.* at 36–69.) On September 2, 2014, ALJ Penalver found that Pica was not disabled within the meaning of the Social Security Act and did not qualify for DIB. (*Id.* at 21–35.) On October 29, 2014, Pica requested a review of the ALJ's decision by the Social Security Appeals Council. (*Id.* at 7–20.) On June 23, 2016, the Appeals Counsel denied Pica's request for review. (*Id.* at 1–6.) On August 17, 2016, Pica commenced this action. (Compl. (Doc. No. 1).)

## II.    Administrative Record

### a.    Non-Medical Evidence

Pica was born on July 20, 1973. (Admin. R. at 166.) He completed one year of college. (*Id.* at 200.) At the time of the ALJ hearing, Pica lived in Staten Island, New York with his wife and three children, ages seven, nine, and twelve. (*Id.* at 40, 46–47.) On a typical day, Pica would take his children to school when physically able, read, and watch television. (*Id.* at 49.) He also indicated that he would prepare light meals, shop at the grocery store for basic items, and perform a few limited household chores. (*Id.* at 47–48.)

Pica worked as a Police Officer from February 1994 to February 1999 and as a Firefighter for the New York City Fire Department ("FDNY") from February 1999 through October 2011. (*Id.* at 42–43, 63, 200.) He earned $80,000 per year and $115,000 per year, respectively. (*Id.* at 200.) While working light-duty, he was in a great deal of pain because he

was required to sit for long periods of time. (*Id.* at 58.) Pica was on light duty at the FDNY for eight months total before being put on medical leave. (*Id.* at 51.)

Pica reported that he stopped working on October 15, 2011, due to severe pain and functional impairments that precluded him from working on a continuous basis and from performing sedentary work. (*Id.* at 242–52.) Pica testified that he can only walk one or two blocks before experiencing lower back pain and would then need to rest for thirty minutes before continuing. (*Id.* at 49–50.) He is able to sit continuously for thirty minutes before needing to stand up and is able to comfortably lift the equivalent of one gallon of milk. (*Id.*) He alleges he is limited in his ability to do any housework and is rarely able to assist his children with homework or attend functions with them. (*Id.* at 48.) Pica testified that "every now and again" he would have severe muscle spasms in his whole back that caused difficulty breathing. (*Id.* at 52–53.) At times, the pain and numbness radiated to his neck, arms, and down to the front of his right thigh. (*Id.* at 56–57.) On an average day, Pica estimates his pain at a six out of ten that would increase to about a seven or eight by the time he went to bed. (*Id.* at 55.)

In the December 2012 disability report filed in connection with this appeal, Pica alleged that he has been disabled since October 15, 2011. (*Id.* at 206.) Pica claims that his conditions stem from a work-related injury that occurred on October 27, 2010. (*Id.* at 203.) He indicated that he has herniations in the thoracic, lumbar, and cervical spine. (*Id.* at 46.)

### b. Medical Evidence Prior to October 15, 2011

#### i. Staten Island University Hospital

On September 10, 2000, Pica went to the emergency room for back pain. (*Id.* at 366.) Pica told the emergency room doctor that he had injured his back at work while using a hand saw to cut a door. (*Id.* at 366–67, 441.) Pica complained of right-sided mid-back pain, radiating to

3

the right buttock. (*Id.* at 441.) He was diagnosed with a lumbar strain and discharged the same day. (*Id.* at 368.)

### ii.     FDNY Medical Examinations

From September 2000 to March 2013, Pica repeatedly visited the FDNY Medical Examiner's office. (*Id.* at 441.) On September 10, 2000, Pica was examined by Dr. Pierce Ferriter of the FDNY. (*Id.*) Dr. Ferriter noted that Pica had limited back movement and radiating pain from his buttock to mid-back. (*Id.*) Dr. Ferriter estimated that Pica could return to full duty in about one week. (*Id.*)

On September 16, 2000, Pica was examined by Dr. Viola Ortiz, who noted Pica exhibited decreased range of motion and discomfort, but that he had no numbness or radiating pain. (*Id.* at 440.) Dr. Ortiz recommended that he continue taking Advil and start Flexeril three times a day. (*Id.*) On September 21, 2000, Dr. Neil Coplan noted that Pica's back strain/sprain was improving. (*Id.* at 439.) Pica had only mild discomfort with forward flexion and his back strength was good. (*Id.*) On September 24, 2000, Dr. Dutkowsky reported that Pica's symptoms had improved and that he was approaching normal and acceptable limits. (*Id.* at 438.) Dr. Dutkowsky recommended that Pica taper off his medication and rest until his scheduled return to full duty on September 28, 2000. (*Id.*)

Six months later, on March 12, 2003, Pica returned to the FDNY for a medical examination. (*Id.* at 437.) Dr. Kerry Kelly diagnosed him with a strained back. (*Id.*) On March 13, 2003, Dr. Gasalberti recommended medication, rest, and stretching for Pica's lower back injury. (*Id.* at 436.) He still had some pain when he was seen again on March 17, 2003. (*Id.* at 435.)

### iii.      Lutheran Medical Center

On October 27, 2010, Pica visited the emergency department at Lutheran Medical Center with complaints of lower back pain allegedly caused by a ceiling falling on him during a fire. (*Id.* at 292, 322, 358.) He denied numbness, tingling, change in ambulation, change in range of motion, or bowel and bladder incontinence. (*Id.* at 292.) On examination, his gait was normal and he had full muscle strength. (*Id.*) Examination of his neck revealed no tenderness and full range of motion. (*Id.*) Pica refused pain medication because his pain was bearable. (*Id.*) Lumbosacral spine x-rays were taken and appeared normal with no indication of fractures, subluxation, degenerative changes, or intervertebral disc spaces. (*Id.* at 297, 329, 365.) Pica was discharged in good condition, and restricted to light duty work for one week. (*Id.* at 293–94.)

### iv.      FDNY Medical Examination – Dr. Lewis Miller

Also on October 27, 2010, Pica was seen by Dr. Lewis Miller, an FDNY doctor, for lower back pain complaints. (*Id.* at 403, 485.) Pica reported that a ceiling and other firefighters fell on him. (*Id.* at 485.) He complained of pain in the right lower back and the right elbow. (*Id.*) Dr. Miller diagnosed Pica with an elbow sprain/strain, a back sprain/strain, and contusions. (*Id.*) On October 30, 2010, Pica reported to Dr. Degennaro that he still had back pain and was taking Flexeril and Motrin. (*Id.* at 484.)

### v.      MRI of the Thoracic Spine – Dr. Haris Sair, M.D.

On November 12, 2010, Pica received magnetic resonance imaging ("MRI") scans of the thoracic and cervical spines performed by Dr. Haris Sair. (*Id.* at 356.) In his report, Dr. Sair noted degenerative changes in the thoracic spine with small multilevel herniations and mild degenerative changes in the cervical spine. (*Id.*)

### vi.    FDNY Medical Examination – Dr. Kattia Olender

At an FDNY examination on November 16, 2010, Pica complained of severe back pain with minimal activity. (*Id.* at 399.) Dr. Kattia Olender recommended two weeks of physical therapy, Flexeril at bedtime, and an orthopedic referral. (*Id.*)

### vii.    Dr. William Kennedy Main, M.D.

On November 22, 2010, Pica saw William Kennedy Main, M.D., at Spinal Surgery. (*Id.* at 353–54.) Dr. Main's examination revealed that Pica's posture, balance, and gait were within normal limits. (*Id.* at 353.) Dr. Main did not observe any spinal deformities – distal circulation was intact, there were no gross deficits of neurological function, and straight leg raising was negative. (*Id.*) He had full and painless range of motion in his hips and knees. (*Id.*) Dr. Main reviewed the MRIs and assessed the herniated discs at the T6–T7 level with diffuse multi-level spondylosis. (*Id.*) Dr. Main recommended an MRI of the lumbar spine and physical therapy. (*Id.* at 353–54.)

### viii.    FDNY Medical Examination– Dr. Danna Mannor

On November 23, 2010, Pica visited Dr. Danna Mannor and reported that Motrin did not relieve his lower back pain or thoracic pain but that he had no spasms. (*Id.* at 398.) Dr. Mannor recommended no lifting or strenuous activity. (*Id.*)

### ix.    MRI of the Lumbar Spine – Dr. David M. Yousem, M.D.

On November 24, 2010, Pica had an MRI of his lumbar spine performed by Dr. David Yousem. (*Id.* at 301, 351.) In his report, Dr. Yousem noted an impression of mild degenerative changes and extensive endplate degenerative changes without significant thecal sac, nerve root, or neural foraminal compromise. (*Id.*) The MRI also revealed the presence of Schmori's nodes. (*Id.*)

### x.      Pain Management – Dr. Brian Maloney, M.D.

On December 3, 2010, Dr. Brian Maloney prescribed Percocet and prednisone. (*Id.* at 396, 478.) He noted that Pica had a sprain or strain in his lower back and that there was evidence of multiple herniations. (*Id.*) Pica was working on a light duty assignment at the time. (*Id.*)

### xi.      FDNY Medical Examinations

On December 22, 2010, Dr. Miller prescribed Naprosyn. (*Id.* at 394.) On December 24, 2010, an examination revealed that Pica had negative straight leg raising with lower back pain. (*Id.* at 393.) He reported lower back pain radiating to his buttocks and upper thighs with limited active range of motion. (*Id.*) On December 29, 2010, Pica requested an epidural injection. (*Id.* at 392, 473.)

### xii.      Dr. Christopher Lutz, M.D.

On January 5, 2011, Pica was treated by Dr. Christopher Lutz. (*Id.* at 348.) Dr. Lutz physically examined Pica and examined his past MRI reports. (*Id.*) He noted an impression of lumbar discogenic pain secondary to paracentral and central disc herniations at L4–5 and L5–S1; bilateral L5 radiculopathy; mild-to-moderate facet arthrosis at L4-5 and L5-S1; and multilevel thoracic herniations with evidence of annular tear. (*Id.* at 349.)

During the examination, Pica was in no apparent distress, was able to move independently from a seated position to standing, and his gait was non-antalgic. (*Id.* at 349.) He was able to heel-toe walk without difficulty and perform single-leg stance and heel raises. (*Id.*) Leg extension was limited at least 30% with pain at the end range. (*Id.*) Seated hip range of motion was full and pain free. (*Id.*) Palpation revealed mild interspinous pain at L5–S1 and L4–5 with mild discomfort at the paravertebral muscles and mid-thoracic spine. (*Id.*) Dr. Lutz assessed: lumbar discogenic pain secondary to paracentral and central disc herniations at L4–5

7

and L5–Sl; bilateral L5 radiculopathy; mild-to-moderate facet arthrosis at L4–5 and L5–S1; and multilevel thoracic herniations with evidence of annular tear, which had significantly improved since the initial injury. (*Id.*) Dr. Lutz recommended a physical therapy program. (*Id.* at 350.)

### xiii. Dr. William Kennedy Main, M.D.

On January 10, 2011, Pica returned to Dr. Main. (*Id.* at 347.) Dr. Main concluded that Pica's reported lower back pain was due to herniated discs at the L4–L5 and L5–S1 with lumbosacral radiculopathy. (*Id.*) Dr. Main opined that Pica should avoid strenuous physical activity, and that he would likely require L4–S1 spinal fusion surgery with instrumentation, bone graft and laminectomy/discectomy. (*Id.*) He advised Pica to seek a second opinion. (*Id.*)

### xiv. Dr. Christopher Lutz, M.D.

On January 18, 2011, Pica went to Dr. Lutz for a fluoroscopically guided contrast-enhanced caudal epidural steroid injection and anesthetic injection with an epidurogram. (*Id.* at 345.) In his operative report, Dr. Lutz noted a pre and postoperative diagnosis of bilateral L5 radiculopathy and central disk protrusions at L4–5 and L5–S1. (*Id.*)

### xv. FDNY Medical Examination – Dr. Danna Mannor

On January 24, 2011, Dr. Danna Mannor recommended that Pica refrain from lifting and strenuous activity. (*Id.* at 389.) Dr. Mannor noted that Pica had undergone an epidural injection the week earlier and was feeling better. (*Id.*) He still reported lower back pain with limited range of motion and spasm in the lumbar spine. (*Id.* at 469.) On February 8, 2011, Dr. Mannor noted that the epidural injection provided temporary relief, but that the symptoms had returned. (*Id.* at 387, 468.) She ordered a second epidural injection. (*Id.*)

### xvi.     FDNY Medical Examinations

On March 1, 2011, Dr. Paul Leo examined Pica and noted that he had had his second epidural injection four days earlier. (*Id.* at 385, 466.) Pica reported that physical therapy had provided no relief. (*Id.*) Dr. Leo reported that Pica had no paresthesia to his legs. (*Id.*)

On March 26, 2011, Pica informed Dr. Leo of persistent lumbar and thoracic pain. (*Id.* at 465.) On April 25, 2011, Pica reported that the second epidural injection provided no relief and that he was considering surgery. (*Id.* at 382, 463.) On May 6, 2011, Dr. Maloney noted Pica suffered from a herniated disc and headaches. (*Id.* at 461.)

### xvii.     Dr. James C. Farmer, M.D.

On May 12, 2011, Pica was treated by Dr. James C. Farmer, M.D., at the Hospital for Special Surgery. (*Id.* at 341–42.) Dr. Farmer's notes reflect that Pica injured himself on October 27, 2010, when he fell inside a building and another firefighter landed on top of him. (*Id.* at 341.) At the time of examination, Pica was alert, oriented, and his gait was normal. (*Id.*) There was tenderness to palpation in the lower lumbar spine in the midline, as well as the upper lumbar spine in the midline. (*Id.*) No abnormal masses were present. (*Id.*)

Pica was able to flex forward bringing his fingers to within six inches of the floor and he was able to extend to 30 degrees and bend bilaterally. (*Id.* at 342.) No gross instability was noted. (*Id.*) Motor strength was full in both lower extremities. (*Id.*) He had full range of motion in his hips without pain. (*Id.*) Dr. Farmer reviewed Pica's 2010 MRI results and opined that he did not see any indications that surgery was necessary. (*Id.*) He recommended continued conservative care. (*Id.*) Dr. Farmer did not believe that Pica would be able to return to normal duties as a firefighter. (*Id.*)

### xviii.    Dr. David Dennihy

On May 15, 2011, Pica reported that he was experiencing back pain and that he was unable to work light duty shifts at the FDNY. (*Id.* at 460.) On May 19, 2011, Dr. Dennihy noted that Pica was ambulatory with no gross deficits. (*Id.* at 459.)

### xix.    FDNY Medical Examination – Dr. Kerry Kelly

On June 21, 2011, an evaluation by Dr. Kerry Kelly, the FDNY Chief Medical Officer, revealed Pica suffered from lumbar spine tenderness and lumbar extension to 30 degrees. (*Id.* at 339.) Dr. Kelly observed that Pica had normal strength, sensation, and deep tendon reflexes of the lower extremities. (*Id.*) Dr. Kelly diagnosed multilevel thoracic disc disease with multilevel herniations, and mild lumbar degenerative changes. (*Id.* at 340.) Dr. Kelly determined that Pica was permanently unfit for regular firefighting duties. (*Id.*)

Between June 2011 and August 2011, Pica was examined by medical staff on behalf of the FDNY who noted herniated discs and back pain. (*Id.* at 451–56.) On August 21, 2011, Pica reported that he felt he was unable to do light duty work. (*Id.* at 452.)

### c.    Medical Evidence after October 15, 2011

### i.    FDNY Medical Examination – Dr. Dutowsky

On October 17, 2011, FDNY medical examiner Dr. Dutowsky, concluded that Pica had herniated discs and that there was no change in his medical condition. (*Id.* at 450.)

### ii.    FDNY Medical Board

On November 25, 2011, the FDNY's Medical Board found that Pica was "permanently disabled due to multilevel degenerative thoracic and lumbar spondylosis, which precludes him from full fire duty." (*Id.* at 337–38.) The FDNY Medical Board also opined that he "may engage in suitable and gainful occupation." (*Id.*)

### iii.        Dr. Brian Maloney, M.D.

On July 17, 2012, Pica's pain management doctor, Dr. Brian Maloney, reported Pica presented complaints of chronic thoracic and lumbar pain. (*Id.* at 565.) On examination, Dr. Maloney observed that Pica had a decreased range of spine motion, lumbar spine muscle spasms, and decreased flexion, extension and rotation of the spine. (*Id.*) Deep tendon reflexes were not elicited and there was no muscle atrophy. (*Id.*) Dr. Maloney reviewed the 2010 MRI results and recommended a series of epidural steroid injections. (*Id.*)

Dr. Maloney examined Pica on August 21, 2012, noting he continued to have decreased flexion, extension, and rotation of the lumbosacral spine. (*Id.* at 299, 567.) Pica had a loss of the normal lumbar curve with pronounced muscle spasms. (*Id.*) There was evidence of bilateral lower extremity radiculopathy. (*Id.*) Dr. Maloney assessed chronic pain syndrome and again recommended "a series of injections." (*Id.*) On November 26, 2012, Dr. Maloney's examination of Pica yielded no change. (*Id.* at 568.)

### iv.        Dr. Sujit Chakrabarti, M.D.

On February 20, 2013, Pica saw Dr. Sujit Chakrabarti for a consultative examination. (*Id.* at 304–06.) Pica brought his lumbar and thoracic spine MRI results to the examination. (*Id.* at 305.) Pica complained of lower back pain, numbness, and burning on the front of both thighs up to the knee. (*Id.* at 305.) Pica related that he injured himself while working for the fire department. (*Id.* at 304.) Pica reported that he drove himself to the examination. (*Id.*) He was able to stand for ten to fifteen minutes, sit for thirty to forty minutes, and walk one to two blocks. (*Id.*) He reported that household chores were mainly done by his wife. (*Id.* at 306.) Dr. Chakrabarti determined that Pica was not in severe pain and had good finger dexterity and grip strength. (*Id.*) Pica's gait and station were normal, he walked with no limp, and he was able to

11

squat without any problem. (*Id.*) Additionally, he had no problem getting onto the examination table. (*Id.*) His shoulders, elbows, wrists, knees, hips, ankles, and cervical spine were normal. (*Id.*) His lumbar spine had limited flexion and extension. (*Id.*) Straight leg raising was positive at 80 degrees on the right leg and 45 degrees on the left leg. (*Id.*) Lumbar spine x-rays revealed that L1 through L5 vertebral bodies were within normal limits and the intervertebral spaces were unremarkable. (*Id.* at 307.) The presence of Schmorl's nodes at the L2–3 and L3–4 levels (normal variant) were observed. (*Id.*) Dr. Chakrabarti diagnosed degenerative disc disease and lumbar radiculopathy. (*Id.* at 306.) His report contains no assessment of functional limitations. (*Id.* at 304–06.)

### v. Dr. Brian Maloney, M.D.

When next seen by Dr. Maloney on March 18, 2013, Pica stated that his pain continued to be "disabling" and he did not benefit from pain medication. (*Id.* at 569.) Dr. Maloney noted that Pica had decreased flexion, extension, and rotation of the lumbosacral spine. (*Id.*) Pica expressed that he wanted to proceed with a lumbar medial branch block to help decrease his back pain. (*Id.*)

Pica returned to Dr. Maloney on June 26, 2013 with complaints of lower back pain. (*Id.* at 570.) On examination, Pica's gait was normal but he appeared to be in pain. (*Id.*) His lower extremity strength was 4/5 and lumbar spine range of motion was limited. (*Id.*) The lumbar spine had palpable muscle spasms. (*Id.*) Dr. Maloney refilled Pica's medications, including Percocet. (*Id.*)

Pica next saw Dr. Maloney on September 12, 2013, when he complained of increased lower back pain that radiated to his legs ending at the knee. (*Id.* at 572.) He had not incurred any new injuries. (*Id.*) Pica needed refills of his medications, including oxycodone, Lyrica, and

12

Protonix. (*Id.*) Dr. Maloney changed Pica's medication from Percocet to oxycodone, citing a stomach irritation. (*Id.* at 573.)

On December 4, 2013, Pica set forth similar complaints to Dr. Maloney and reported back pain that radiated into his legs and was aggravated by standing, sitting, and walking for long periods. (*Id.* at 574.) His pain improved with rest. (*Id.*) Pica was not undergoing any treatment modalities at the time. (*Id.*) After another examination on February 12, 2014, Dr. Maloney's diagnosis was unchanged. (*Id.* at 576.)

On May 1, 2014, Dr. Maloney completed a "Functional Assessment to do Sedentary Work." (*Id.* at 582–83.) Dr. Maloney concluded that Pica was limited to less than two hours of standing and/or walking in an eight-hour workday, and sitting for less than four hours. (*Id.* at 582.) Pica was able to lift and/or carry between five and ten pounds for one-third of the day and less than five pounds for the remainder of the day. (*Id.*) Dr. Maloney further opined that Pica required frequent breaks of 15 minutes or more each during the work day, and that he would have difficulty concentrating due to pain and medications. (*Id.* at 583.) Furthermore, he would be off task more than 10% of the work day. (*Id.*) Dr. Maloney also concluded that Pica: had environmental restrictions due to physical limitations and/or sensitivity; would require an average of three or more sick days off per month; required medications that would interfere with his ability to function in the work setting; and had pain that prevented him from performing eight hours of work. (*Id.*) Dr. Maloney based his opinion on the November 2010 MRI results. (*Id.* at 583.)

### d.    Vocational Expert Evidence

Michael Smith testified as a vocational expert ("VE") via telephone, at Pica's hearing. (*Id.* at 24, 36, 38.) The ALJ first asked the VE to identify the past work performed by the

13

claimant using the Dictionary of Occupational Titles. (*Id.* at 63.) The VE classified Pica's job as firefighter (DOT Code No. 373.367-010),[3] which is considered a skilled occupation. (*Id.*) The VE stated that the DOT describes this occupation as medium exertion level. (*Id.*) However, from the documents he reviewed, it seems like Pica performed the job at a heavier level. (*Id.*) The ALJ then asked the VE several hypotheticals. (*Id.* at 64.)

First, the ALJ asked the VE to consider an individual with the same age, educational background, and work experience as Pica. (*Id.*) The ALJ also asked the VE to assume that this individual was subject to the following limitations: limited in foot control operations with the right lower extremity; could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps or stairs; occasionally stoop, crouch, or kneel; and could never crawl. (*Id.* at 64–65.) Further, the ALJ asked the VE to assume that this individual was allowed a sit-stand option provided that the person is not off task for more than 5 percent of the work period. (*Id.* at 65.) The ALJ then asked the VE if such an individual, who is able to perform light work as defined by the regulations, would be capable of performing the job of firefighter. (*Id.*) The VE testified that such a person would not be able to perform the job of firefighter. (*Id.*)

The VE provided three examples of jobs in the national economy that such an individual could perform: (1) investigator, dealer accounts (DOT Code No. 241.367-039) with an estimated 192,910 positions in the national economy for those at a light exertion level; (2) tanning salon attended (DOT Code No. 359.567-014) with an estimated 18,410 positions in the national economy for those at a light exertion level; and (3) arcade attendant (DOT Code No. 342.667-014) with an estimated 243,110 positions in the national economy for those at a light exertion level. (*Id.* at 65–66.) Before the second hypothetical, the ALJ asked the VE how many

---

[3] The "DOT" numbers refer to the corresponding occupation code in the U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed., rev'd 1991), *available at* www.oalj.dol.gov/LIBDOT.HTM.

unexcused or unscheduled absences employers customarily allow for their employees per month. (*Id.* at 66.) The VE stated, in his opinion, more than one such absence per month would not allow the individual to maintain their job. (*Id.*) The ALJ then asked what percentage of time off-task employers customarily permit their employees. (*Id.*) The VE stated, in his opinion, if it was over 10 percent the individual would likely not be able to maintain their job. (*Id.*)

Under the second hypothetical, the ALJ asked about job options for an individual with Pica's age, education, and work experience, who was capable of carrying up to four pounds maximum on an occasional basis, capable of standing or walking for approximately one and a half hours total per eight-hour work day, and capable of sitting for approximately three and a half hours total per eight-hour work day. (*Id.*) The VE testified that he does not believe there is a job in the national economy that such an individual could perform. (*Id.* at 67.)

## STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

When reviewing the final determination of the Commissioner, the Court does not make an independent determination about whether a claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

15

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." (*Id.*) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." (*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).)

## II.    Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must produce medical and other evidence of his disability. *See* 42 U.S.C. § 423(d)(5)(A). To be found disabled, the claimant must have been unable to work due to a physical or mental impairment resulting from "anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). This impairment must have lasted or be expected to last for a continuous period of not less that twelve months. *Id.*; *see also Barnhart v. Walton*, 535 U.S. 212 (2002). Further, the applicant's medically determinable impairment must have been of such severity that he is unable to do his previous work or, considering his age, education, and work experience, he could not have engaged in any other kind of substantial gainful work that exists in the national economy. *See* 42 U.S.C.

§ 423(d)(2)(A). In determining whether a claimant is disabled, the Commissioner engages in the following five-step analsyis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I.    The ALJ Properly Followed the Five-Step Analysis

First, the ALJ determined that Pica has not engaged in substantial gainful activity since his alleged disability onset date of October 15, 2011. (Admin. R. at 26.) Second, the ALJ found that Pica has the severe impairment of degenerative disc disease. Third, the ALJ found that Pica does not have an impairment which is listed in Appendix 1 of the regulations, and so Pica is not *per se* disabled for purposes of DIB. Fourth, the ALJ found that Pica is unable to perform any

17

past relevant work. Fifth, the ALJ determined that given Pica's residual functional capacity, a significant number of jobs exist in the national economy that he could perform. Accordingly, the ALJ properly followed the required five-step analysis.

## II. The ALJ Properly Applied the Treating Physician Rule

In making Pica's RFC determination, the ALJ correctly assigned greater weight to the opinions of Drs. Main, Gasalberti, and Chakrabarti than Dr. Maloney.[4] (*Id.* at 20–21.)

Generally, opinions of treating physicians are given "controlling weight" because they "provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. 404.1527(c)(2). However, opinions of treating physicians must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" as well as "not inconsistent" with other substantial evidence in record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). In other words, an ALJ's RFC determination does not have to perfectly correspond to any

---

[4] Pica argues that the ALJ failed to fully develop the medical record in making his RFC determination. (Pl.'s Mem. at 15); *LaMay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–509 (2d Cir. 2004) ("[The Social Security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record . . . ."); *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."). Pica asserts that the ALJ breached this duty by failing to contact Dr. Maloney for the clinical findings that supported his opinion. (Pl. Mot. at 15.) However, "[w]hile the ALJ must supplement the record through his own initiatives when the record is incomplete or inadequate, this burden does not attach when the record is ample." *Valoy v. Barnhart*, No. 02-CV-8955 (HB), 2004 WL 439424, at *7 (S.D.N.Y. Mar. 9, 2004); *accord Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) (finding that the ALJ need not seek out additional medical information where there is no indication in the record that the relevant medical evidence is inconclusive); *Lowry v. Astrue*, 474 F. App'x. 801, 804 (2d Cir. 2012) ("Although an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'") (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999). Here, as evidenced in part by the ALJ's robust comparison of the medical evidence offered by Pica's internists and the consultative physician, it is clear that the "record contained sufficient evidence to make a disability determination, and the ALJ was under no obligation to seek additional treatment records. Therefore, the ALJ "properly satisfied his duty to develop the record." *Martinez-Paulino v. Astrue*, No. 11-CV-5485 (RPP), 2012 WL 3564140, at *14 (S.D.N.Y. Aug. 20, 2012).

single medical opinion as long as it is consistent with the record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). The ALJ must also provide "good reason" for assigning a certain weight to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("[T]he ALJ must comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.") (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

Pica argues that the ALJ improperly afforded more weight to the findings of Dr. Main, Dr. Gasalberti, and Dr. Chakrabarti than Dr. Maloney. Specifically, Pica asserts that it was improper to rely on Dr. Main and Dr. Chakrabarti because they based their findings on an MRI that precedes the alleged onset date, rather than Dr. Maloney's pain assessments conducted after the alleged onset date. However, Dr. Maloney's functional assessment that Pica could perform only sedentary work was also based on the same MRI. (*See* Admin. R. at 583.) It makes little sense to find fault with the ALJ's reliance on the four-year old MRI results while simultaneously urging reliance on Dr. Maloney's opinion which was based on the same results.

The ALJ properly found that Dr. Maloney's reading of the MRI was inconsistent with two other treating physicians' and a consultative physician's reading of the MRI. (*See* Admin. R. at 30.) The ALJ gave significant weight to the opinions of Dr. Main and Dr. Gasalberti because "they are consistent with diagnostic images of the claimant's spine, which reveal he has no more than moderate injuries to his spine with no involvement of a nerve root or the spinal canal." (*Id.*) Those opinions contrast Dr. Maloney's opinion that the diagnostic images reveal suggest that Pica is limited to less than the full range of sedentary work. (*Id.*); *see Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("[W]hile the opinions of a treating physician

deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record.")

The ALJ also noted internal consistencies in Dr. Maloney's opinion. For example, the ALJ found that Dr. Maloney's observation that Pica had intact sensations and a normal gait is inconsistent with a finding of anything more than moderate limitations. (*Id.*) The inconsistency in his own reports provide evidence that Dr. Maloney's opinion should be accorded "little weight." *Heitz v. Commissioner of Social Security*, 201 F. Supp. 3d 413, 421 (S.D.N.Y. 2016) (holding that a treating physician's opinion should be rejected because it is internally inconsistent and contradicted by other medical evidence); *Vanterpool v. Colvin*, No. 12-CV-8789 (VEC) (SN), 2014 WL 1979925, at *4 (S.D.N.Y. May 15, 2014) ("[T]he ALJ cannot discount a treating physician's opinion unless it 'lack[s] support or [is] internally inconsistent.") (quoting *Duncan v. Astrue*, No. 09-CV-4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)); *Illenberg v. Colvin*, No. 13 Civ. 9016 (AT)(SN), 2014 WL 6969550, at *20 (S.D.N.Y Dec. 9, 2014) ("[W]hen a treating physician's opinion is internally inconsistent or inconsistent with other substantial evidence in the record, the ALJ may give the treating physician's opinion less weight.").

The ALJ properly gave less weight to Dr. Maloney's opinion because it was contradicted by other substantial evidence in the record, such as the opinions Drs. Main, Gasalberti, and Chakrabarti. *See Monroe v. Commissioner of Soc. Sec.*, No. 16-CV-1042, 2017 WL 213363, at *1 (2d Cir. 2017) (summary order) (treating physician opinions are not entitled to controlling weight if they are contradicted by other evidence of record). In turn, the ALJ was entitled to rely on Dr. Chakrabarti consultative examiner's opinion because his opinion was consistent with the record as a whole – the MRI and the opinions of Drs. Main and Gasalberti. *See Pellam v. Astrue,*

508 F. App'x 87, 90 (2d Cir. 2013) (summary order) (medical opinions of consultative

examining physicians can constitute substantial evidence); *Camille v. Colvin,* 652 F. App'x 25,

27 (2d Cir. 2016) (same); *Lamond v. Astrue,* 440 F. App'x 17, 21–22 (2d Cir. 2011) (same);

*Netter v. Astrue,* 272 F. App'x 54, 55–56 (2d Cir. 2008) (same).

     Overall, substantial evidence supports the conclusion that Dr. Maloney's medical

opinions are inconsistent internally, and contrary to the reports of Drs. Main, Gasalberti, and

Chakrabarti. Therefore, the ALJ was entitled to give little weight to Dr. Maloney's opinion.

### III.    The ALJ Properly Evaluated Pica's Credibility

     A credibility finding by an ALJ is entitled to deference by a reviewing court "because

[the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor." *Gernavage v.

Shalala,* 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995). The ALJ must analyze the credibility of

a claimant as to his symptoms through a two-step test. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir.

2010). The ALJ must first decide "whether the claimant suffers from a medically determinable

impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20

C.F.R. § 404.1529(b)). Next, if the ALJ determines that the claimant does have such an

impairment, he must consider "'the extent to which the claimant's symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence' of record." *Id.*

(quoting 20 C.F.R. § 404.1529(a) (alterations omitted)). When evaluating the "intensity,

persistence and limiting effects of symptoms, the Commissioner's regulations require

consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective*

testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH),

2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015). These seven objective factors are:

> (i) [the] claimant's daily activities; (ii) [the] location, duration[,] frequency, and
> intensity of [the] claimant's pain or other symptoms; (iii) precipitating and

aggravating factors; (iv) [the] type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate [the claimant's] pain or other symptoms; (v) treatment, other than medication, [the] claimant receives or has received for relief of her pain or other symptoms; (vi) measures [the] claimant uses or has used to relieve pain or other symptoms; and (vii) other factors concerning [the] claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *5 n.22 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not require remand." *Id.*

Here, the ALJ explicitly followed the two-step process in considering Pica's symptoms. (*See* Admin. R. at 27.) After reviewing the medical evidence, the ALJ found Pica's subjective assessment of pain and limitation to be only partially credible. As noted above, the ALJ properly gave more weight to the opinions of Drs. Main, Gasalberti, and Chakrabarti than Dr. Maloney. In doing so, the ALJ found that the medical evidence supports a finding of only "moderate injuries" rather than the severe pain and limitations that Pica suggests. (*Id.* at 29.) Thus, the ALJ properly followed the two-step credibility analysis, reviewed conflicts in the medical records, and resolved the conflicts against Pica's subjective assessment of his condition. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.") Accordingly, the extensive medical record provides substantial evidence in support of the ALJ's credibility determination.

## IV. Substantial Evidence Supports the ALJ's RFC Determination

The responsibility for determining a petitioner's RFC rests solely with the ALJ. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546. In determining the RFC, the ALJ must consider all medical opinions together with other relevant evidence. 20 C.F.R. § 404.1527. Through this process, it is for the ALJ to resolve genuine conflicts in the evidence. *Veino*, 312 F.3d at 588; *accord Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record."); 20 C.F.R. § 404.1527(c)(4). Here, the ALJ reasonably concluded that Pica had the RFC to perform less than the full range of light work. (Admin. R. at 27.) Specifically, the ALJ found that that Pica has the ability to

> occasionally lift and/or carry up to 20 pounds, and frequently lift/carry up to 10 pounds. He also has the ability to stand and/or walk (with normal breaks) for a total of up to 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of up to 6 hours in a workday. The claimant must be allowed to have a sit/stand option allowing him to sit or stand alternatively at will, which will leave him off task for up to 5 percent of the work period. The claimant can only occasionally operate foot controls with his right lower extremity. He can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps or stairs. Moreover, the claimant can only occasionally stoop, crouch and kneel, and can never crawl.

(*Id.*) The ALJ's RFC determination is supported by substantial evidence. Specifically, the ALJ's opinion is supported by the medical opinions of Dr. Main, Dr. Gasalberti, and Dr. Chakrabarti.

The ALJ afforded significant weight to the opinions of Dr. Main and Dr. Gasalberti, who found that Pica was limited to light-duty work. (*Id.* at 29–30.) The ALJ found that their opinions are "consistent with diagnostic images of the claimant's spine, which reveal he has no more than moderate injuries to his spine with no involvement of a nerve root or the spinal canal." (*Id.*) The ALJ also noted that their physical exams revealed that Pica "has a normal gait, no neurological deficits, and negative straight leg raising, further suggesting the claimant has no more than moderate symptoms." (*Id.*) As noted above in Section II, the ALJ properly afforded

greater weight to the opinions of Dr. Main and Dr. Gasalberti than the opinion of Dr. Maloney. In addition, even Dr. Maloney's opinion that Pica "has intact sensations and a normal gait" suggests "no more than moderate limitations." (*Id.*) Accordingly, the record contains ample evidence to support the ALJ's conclusion that Pica can engage in some light work. (*Id.*)

## V.   Substantial Evidence Supports the ALJ's Finding That Pica Was Capable of Performing a Significant Number of Jobs in the National Economy

At step five of the disability analysis, the ALJ must consult the applicable Medical Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). An ALJ may rely on a vocational expert to determine whether there is work that exists in significant numbers in the national economy that a claimant could perform, given his vocational factors and RFC. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983).

Here, the ALJ asked VE Michael Smith several hypotheticals meant to capture Pica's RFC. (*See* Admin. R. at 64.) First, the ALJ asked the VE to consider an individual with the same age, educational background, and work experience as Pica. (*Id.*) The ALJ also asked the VE to assume that this individual was subject to the following limitations: limited in foot control operations with the right lower extremity; could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps or stairs; occasionally stoop, crouch or kneel; and could never crawl. (*Id.* at 64–5.) Further, the ALJ asked the VE to assume that this individual was allowed a sit-stand option provided that the person is not off task for more than 5 percent of the work period. (*Id.* at 65.)

Based on Pica's RFC, the VE provided three examples of jobs in the national economy that such an individual could perform: (1) investigator, dealer accounts (DOT Code No. 241.367-039) with an estimated 192,910 positions in the national economy for those at a light exertion

24

level; (2) tanning salon attended (DOT Code No. 359.567-014) with an estimated 18,410 positions in the national economy for those at a light exertion level; and (3) arcade attendant (DOT Code No. 342.667-014) with an estimated 243,110 positions in the national economy for those at a light exertion level. (*Id.* at 31, 65–6.)

Based on that testimony, the ALJ concluded that Pica was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 32.) That Pica could perform available jobs provides sufficient evidence that "a reasonable mind might accept as adequate to support" the ALJ's determination. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted). As such, the ALJ's conclusion that Pica was not entitled to DIB is supported by substantial evidence in the record.

## CONCLUSION

For the reasons stated herein, Pica's motion for judgment on the pleadings (Doc. No. 14) is denied, and the Commissioner's cross-motion for judgment on the pleadings (Doc. No. 16) is granted.

The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
     September 20, 2017

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge